UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

KATHRYN WOODS, and MELISSA WOODS,

        Plaintiffs,
v.　　　　　　　　　　　　　　　　　　　　　　　**DECISION AND ORDER**
　　　　　　　　　　　　　　　　　　　　　　　　11-CV-343S
TOWN OF CHEEKTOWAGA,
CHEEKTOWAGA POLICE DEPARTMENT,
OFFICER NEIL C. HELD, OFFICER
BRADFORD HEBELER, and JOHN and JANE
DOE,

        Defendants.

## I. INTRODUCTION

Plaintiffs commenced this action seeking damages pursuant to 42 U.S.C. § 1983 and New York State law. Presently before this Court is Defendants' motion for summary judgment dismissing the amended complaint in its entirety. The Court has considered the submissions and finds oral argument unnecessary. For the reasons that follow, Defendants' motion is granted in part and denied in part.

## II. BACKGROUND

This action stems from the events of February 13, 2010, when Defendant Neil C. Held was dispatched to a domestic disturbance at the residence of Robert Geddes. (Dep. of Officer Neil C. Held at 17-20, Docket No. 11 Ex. C.) Geddes is the father of Plaintiff Melissa Woods' youngest child, and an order of protection was in place between Melissa

1

and Geddes. (Held Dep. at 22; Aff. of Melissa Woods ¶ 8, Docket No. 13-7.) Geddes reported to Officer Held that the two had gotten into a verbal argument, following which Melissa stole Geddes' keys to his residence, thereby locking him out. (Held Dep. at 22.) Geddes further reported that Melissa was intoxicated and operating a vehicle, which he described for Held. (Id. at 22, 27-28.) Officer Held corroborated Geddes' story with a neighbor. (Id. at 25-26.)

Officer Held determined that, based on Melissa's reported behavior, the order of protection had been violated. (Id. at 22.) He located the vehicle in which Melissa was reported to have driven away outside the house of her mother, Plaintiff Kathryn Woods. (Id. at 35.) He then requested assistance, and Defendant Bradford Hebeler arrived sometime thereafter. (Id. at 37.) Officer Hebeler positioned himself by the corner of the house, where he could observe if anyone tried to leave while Officer Held was at the front door. (Dep. of Bradford Hebeler at 18, Docket No. 11 Ex. D.)

Officer Held approached the house, and Kathryn opened the front door. (Held Dep. at 38-39.) Held recalls asking about the whereabouts of Melissa and having "a lengthy conversation eight to ten minutes long" with Kathryn at the door, but he does not recall the specifics of the conversation. (Held Dep. at 39-40.) According to Kathryn, Officer Held questioned her at the door for five to ten minutes, "trying to get me to cooperate and I said, I'll do anything when you come back with a warrant. And I said my daughter could be anywhere, and he said that is it." (Dep. of Kathryn Woods at 43-44, Docket No. 13 Ex. B.) Kathryn further testified that she asked Held for a warrant, but "he wasn't willing to provide that at the time, so I didn't feel I had to answer his questions. I like to cooperate, but I wanted a warrant from him." (Id. at 44.)

2

Kathryn describes the officers' entry into the home as follows: Officer Held "opened up the front door and he pushed his way, pushed me into the closet door, pushed his way into the living room and I had a phone in my hand and I started to call 911, he grabbed the phone from my hand and he threw it and he proceeded to run up the stairs." (Dep. of Kathryn Woods at 46-48.) Officer Hebeler followed Held into the home. (Id. at 47, 51.) The officers entered Kathryn's room upstairs, where Melissa was sleeping. (Id. at 51-52.) As Officer Held "grabbed [Melissa's] hands, started putting handcuffs on her and pushed the blanket back to be able to get at her," Kathryn noticed that her grandson was also in the bed. (Id. at 52.) Kathryn "reached to protect [her] grandson," and Officer Held "grabbed [Kathryn] around [her] throat with a hand" and said that "he could arrest [her], too." (Id. at 53, 56, 58.)

According to Kathryn, Officer Held then "yanked [Melissa] out of bed" and led her into the hallway. (Id. at 59-60.) Although Officers Held and Hebeler described Melissa as struggling and kicking Officer Held, (Held Dep. at 50, 54; Hebeler Dep. at 25, 28), Kathryn testified that Melissa did not appear to be struggling or resisting. (Kathryn Dep. at 59-60.) Instead:

> [S]tanding at the top of the stairs in front of the bathroom [Held] put himself in between me and my daughter and him, and it is hard to go down stairs handcuffed with somebody, he was holding onto her by the handcuffs and he was like yanking her and I said, quit hurting her. And I looked at Hebeler square in the face and I said, are you going to just stand here and watch him do this, and he just looked at me with like no response. And about five, six stairs down [Held][1] kneed her really hard in the back.

(Id. at 61-62; Dep. of Melissa Woods at 52, Docket No. 13 Ex. A.) Officer Held told Melissa

---

[1] Kathryn said 'Hebeler' here, but in light of the context, it is clear that she intended to say 'Held.'

3

to "quit resisting," to which Kathryn responded, "she's not resisting." (Dep. of Kathryn Woods at 63.)

Melissa testified that she asked Officer Held to allow her to put her sneakers on, but Held refused and placed her in the police car in bare feet. (Dep. of Melissa Woods at 47-48.) She had a cell phone in her pocket which she used to dial 911. (Id. at 47, 49.) When Officer Held realized that she was on the phone, he grabbed it from Melissa and told the 911 dispatcher that if the dispatcher "reported this that [Held] would have his job." (Id. at 51.) Officer Held then drove Melissa to the police station by "speeding down Walden and slamming on his brakes, kept speeding up and slamming on his brakes, he didn't have me buckled." (Id. at 53.) At least once when Held hit the brakes, Melissa's forehead hit the plastic divider in the police car. (Id. at 53-54.)

Once at the police station, Melissa told a male officer that she "needed medical treatment, that my back was hurting, and my side, my wrist." (Id. at 55.) She also told Officer Held that she needed medical attention when he placed her in a cell, and he responded that he would call Melissa's mother and tell her that Melissa was okay. (Id. at 59.) When Melissa was taken to be fingerprinted, she told a female officer that she needed medical attention because she did not "feel good," and the officer told Melissa that she would not be able to get medical attention until after she saw the judge. (Id. at 61.) Melissa did not receive medical attention until after she was released the next day, and at that time she was diagnosed with a wrist sprain and a sacrum-coccyx contusion. (Aff. of Melissa Woods ¶¶ 44-50.)

Plaintiffs commenced the instant action in Supreme Court for the State of New York, Erie County, in February 2011. (Am. Compl., Docket No. 1 Ex. A.) Defendants removed

4

the matter to this Court shortly thereafter. (Docket No. 1.)  Plaintiffs' amended complaint asserts nine different causes of action, including four seeking damages pursuant to 42 U.S.C. § 1983 against all named[2] Defendants for warrantless entry, deliberate indifference to medical need, and excessive force.  Plaintiffs also assert state law claims for battery, assault, intentional infliction of emotional distress, and, as against the Town of Cheektowaga ("the Town") and the Cheektowaga Police Department, negligent hiring, supervision, and training.  Defendants now move for summary judgment dismissing the amended complaint in its entirety.[3]

### III.  DISCUSSION

"A motion for summary judgment may properly be granted . . . only where there is no genuine issue of material fact to be tried, and the facts as to which there is no such issue warrant the entry of judgment for the moving party as a matter of law." Kaytor v. Elec. Boat Corp., 609 F.3d 537, 545 (2d Cir. 2010) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). A court's function on a summary judgment motion "is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists." Kaytor, 609

---

[2] The 'John and Jane Doe' listed as defendants appear to be the male and female officer who allegedly ignored Melissa's requests for medical attention.  As discussed below, that cause of action, and therefore any as-yet-unnamed defendants, is dismissed.

[3] In support of their motion, Defendants submit the Attorney Affidavit of Marylou K. Roshia, Esq., with Exhibits A-F, a supporting Memorandum of Law, and a Rule 56 statement. (Docket No. 11.)  Plaintiffs oppose the motion with the Attorney Declaration of Steven M. Cohen, Esq., with Exhibits A-D, the Affidavits of Plaintiff Melissa Woods and Kathryn Woods, a Memorandum of Law in Opposition, and a Rule 56 statement, (Docket No. 13.)  Defendants filed the Reply Affidavit of Attorney Roshia with Exhibit A and a reply Memorandum of Law. (Docket No. 14.)

F.3d at 545. "A dispute regarding a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Weinstock 224 F.3d at 41 (quoting Anderson, 477 U.S. at 248). Further, a court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." Dallas Aerospace, Inc. v. CIS Air Corp., 352 F.3d 775, 780 (2d Cir.2003).

### A.     Municipal Liability under § 1983

Initially, Plaintiffs have conceded that Defendant Cheektowaga Police Department should be removed from the action, (Pls' Mem of Law at 21, Docket No. 13), and that Defendant will therefore be dismissed. See Baker v. Willett, 42 F.Supp.2d 192, 198 (N.D.N.Y. 1999) (a police department is an administrative arm of a municipal corporation and does not have a separate legal identity). Defendants further argue that Plaintiffs' § 1983 claims must be dismissed as against the Town as well. (Defs' Mem of Law at 16-17, Docket No. 11.)

Although an employer may not be held vicariously liable under § 1983, "[a] municipality or other local government may be liable under this section if the governmental body itself 'subjects' a person to a deprivation of rights or 'causes' a person 'to be subjected' to such deprivation." Connick v. Thompson, __ U.S. __,131 S. Ct. 1350, 1359, 179 L. Ed. 2d 417 (2011) (citing Monell v. New York City Dept. of Social Servs., 436 U.S. 658, 692, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978)). For example, a plaintiff can establish a municipality's liability by proving that "'action pursuant to official policy' caused [her] injury." Connick, 131 S. Ct. at 1359 (quoting Monell, 436 U.S. at 691). "Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking

6

officials, and practices so persistent and widespread as to practically have the force of law." Id.

Here, Defendants argue that Plaintiffs' "conclusory allegations against the Town that it did not adequately train and supervise its officers" are unsupported by evidence that an alleged violation of Plaintiffs' constitutional rights was a consequence of a municipal policy or custom. (Defs' Mem of Law at 16-17.) Plaintiff responds that the Town "has policies or customs which allow officers to forego the necessity of a warrant, to use greater force than is required to effectuate an arrest, to fail to follow the use of force continuum, and to deprive arrestees medical attention, all in violation of [the Town's] own policies and procedures." (Pls' Mem of Law at 21.)

Municipal liability under § 1983 may be established by, among other things, evidence establishing that:

> (1) the municipality is aware that its policy for handling a given situation, although not unconstitutional in itself, may be applied unconstitutionally, but nevertheless consciously choose not to train its employees in proper application of the policy; or (2) the municipality's practice, as opposed to its formal policy, is to engage in the constitutional violation at issue.

Green v. City of New York, 465 F.3d 65, 80 (2d Cir. 2006). Here, however, Plaintiff offers no evidence of any alleged constitutional violation other than those involving Plaintiffs themselves on February 13th. Accordingly, there is no evidence from which a jury could infer that the practice of Town police officers entering a home without a warrant, using excessive force, or refusing to provide requested medical treatment was so persistent or widespread "as to imply the constructive acquiescence of senior policy-making officials." Green, 465 F.3d at 80 (quoting Sorlucco v. N.Y. City Police Dep't, 971 F.2d 864, 870 (2d Cir. 1992)).

7

Further, an alleged failure to train "will trigger municipal liability 'only where the failure to train amounts to deliberate indifference to the rights' of members of the public with whom the employees will interact." Green, 465 U.S. at 80 (quoting City of Canton v. Harris, 489 U.S. 378, 388, 109 S. Ct. 1197, 103 L. Ed. 2d 412 (1989)). "[A]t the summary judgment stage, plaintiffs must 'identify a specific deficiency in the [municipality's] training program and establish that that deficiency is closely related to the ultimate injury, such that it actually cause the constitutional deprivation here." Id. at 81 (quoting Amnesty Am. v. Town of Hartford, 361 F.3d 113, 129 (2d Cir. 2004). Plaintiffs make no attempt to do so here, but instead rely on conclusory assertions of an unwritten policy. The § 1983 claims against the Town are therefore dismissed.

**B.    Individual Defendants' Liability under § 1983**

*1.    Warrantless Entry*

In their first cause of action, Plaintiffs seek damages for the entry of Defendants Held and Hebeler into Kathryn's house without a warrant or reasonable suspicion that a crime was being or was about to be committed in violation of Plaintiff's Fourth Amendment rights. (Am. Compl. ¶¶ 43-46.) Defendants argue that exigent circumstances existed necessitating the warrantless entry, specifically Officer Held's reasonable belief that Melissa was in need of immediate aid. (Defs' Mem of Law at 6-9.) This argument is patently without merit.

"Warrantless searches inside a home are presumptively unreasonable." Tierney v. Davidson, 133 F.3d 189, 196 (2d Cir. 1998) (citing Payton v. New York, 445 U.S. 573, 586, 100 S. Ct. 1371, 63 L. Ed. 2d 639 (1980)). "One exigency obviating the requirement of a warrant is the need to assist persons who are seriously injured or threatened with such

injury. The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency." Brigham City, Utah v. Stuart, 547 U.S. 398, 403-04, 126 S. Ct. 1943, 164 L. Ed. 2d 650 (2006) (internal quotation marks omitted). In arguing that this exception applies here, Defendants rely primarily on Officer Held's knowledge that Melissa was intoxicated when she drove away from the argument at Geddes' residence. (Defs' Mem of Law at 7.) By the time Officer Held located the vehicle in which Melissa drove away, however, the vehicle was parked and Melissa was inside Kathryn's home. Further, Officer Held testified that a verbal argument had been reported, (Held Dep. at 22), therefore there was no basis for a belief that Melissa had been physically harmed in the domestic dispute that had occurred at another location. Compare with Tierney, 133 F.3d at 197 (reasonable for an officer responding to a domestic disturbance reported to be the "worst yet at this location according to experienced observers" to enter suddenly silent house in light of possible presence of injured person). Notably, although Officer Held asserts his belief that Melissa's "welfare was in question," according to his own testimony, upon waking her in her mother's house, he immediately informed Melissa she was under arrest and handcuffed her. (Id. at 42, 48.) There is no evidence in this record that he in fact inquired into her welfare.

Additionally, because Melissa left the scene of the domestic disturbance, this case is much more akin to Welsh v. Wisconsin. 466 U.S. 740, 743, 753, 104 S. Ct. 2091, 80 L. Ed. 2d 732 (1984). There, the Supreme Court held the warrantless entry of officers into the home of a suspect to effect his arrest for the noncriminal traffic offense of driving under the influence was unreasonable under the Fourth Amendment. 466 U.S. at 743, 753. "[A]n important factor to be considered when determining whether any exigency exists is the

gravity of the underlying offense for which the arrest is being made." Id. at 753. Here, the officers entered Kathryn's house for the purpose of arresting Melissa for the prior, not ongoing, offense of violating an order of protection. (Held Dep. at 28, 42, 48.) The little evidence in the record regarding this order indicates that it was a no offensive contact order, not a no contact order. Indeed, there is even less cause for the warrantless entry in this case than in Welsh, where the investigating officers were concerned that "evidence of the suspect's blood-alcohol level might have dissipated while the police obtained a warrant." Welsh, 466 U.S. at 754. Here, by all accounts, no new evidence was obtained by Officer Held after entering the house, and there appears no reason why he could not have obtained a warrant prior to arresting Melissa.

    2.    *Excessive Force*

Defendants argue that the excessive force claims should be dismissed because "it was objectively reasonable for Officer Held to assist Melissa Woods down the stairs by holding on to the handcuffs and maintaining contact with her shoulder." (Defs' Mem of Law at 12); see generally Graham v. Connor, 490 U.S. 386, 395, 109 S. Ct. 1865, 104 L. Ed. 2d (1989) (claims of excessive force in the course of an arrest, stop, or other seizure analyzed under the Fourth Amendment's reasonableness standard). Ignoring the well-established standard that the facts on a summary judgment motion must be construed in the light most favorable to the non-moving party, Dallas Aerospace, Inc., 352 F.3d at 780, Defendants base their reasonableness argument on only the deposition testimony of Defendants Held and Hebeler, who each describe Melissa as resisting arrest and kicking Officer Held on the way down the stairs. (Defs' Mem of Law at 11; Held Dep. at 50, 54; Hebeler Dep. at 25, 28.) The discrepancies between the officers' version and Plaintiffs

10

version cannot be accounted for by subjective differences in perspective.  See generally Lowth v. Town of Cheektowaga, 82 F.3d 563, 573 (2d Cir. 1996) (courts must consider the perspective of the officer when considering excessive force claims). Further, Defendants fail to address Melissa's claim that Officer Held caused her injury by driving recklessly, or Kathryn's separate claim that Held grabbed her by the neck.  (Am. Compl. ¶¶ 39, 57, 68.)

Finally, Defendants' argument that these claims should be dismissed against Officer Hebeler for lack of personal involvement fails to account for Plaintiffs' assertion of a failure to intervene claim against this Defendant.  (Id. ¶ 68.)  A law enforcement official has an affirmative duty to intervene on behalf of a citizen whose constitutional rights are being violated in his presence by other officers.  Curley v. Village of Suffern, 268 F.3d 65, 72 (2d Cir. 2001).  Here, considering the facts in a light most favorable to Plaintiffs, Kathryn testified that Hebeler witnessed Held "yanking" Melissa down the stairs and kneeing her in the back, but did nothing despite Kathryn's express request that he intervene.  (Dep. of Kathryn Woods at 60-62.) Accordingly, viewing the facts in a light most favorable to Plaintiffs, as this Court must, this part of Defendants' motion for summary judgment must be denied.

*3. Deprivation of Medical Treatment*

Plaintiff alleges that her requests for medical attention after her arrest, made to Officer Held, as well as an unidentified male and an unidentified female officer, were ignored. (Dep. of Melissa Woods at 55, 58-59, 61.)  A deliberate indifference to a serious medical condition claim requires a plaintiff to establish that she had a "serious medical condition" that was met with "deliberate indifference."  Caiozzo v. Koreman, 581 F.3d 63, 72 (2d Cir. 2009) (quoting Cuoco v. Moritsugu, 222 F.3d 99, 106 (2d Cir. 2000)).  A

sufficiently serious medical condition is one "which 'contemplates a condition of urgency, one that may produce death, degeneration, or extreme pain.' " Covington v. Westchester County Dep't of Corr., No. 06-Civ-5369, 2010 WL 572125, *5 (S.D.N.Y. Jan. 25, 2010) (quoting Hathaway v. Coughlin, 37 F.3d 63, 66 (2d Cir. 1994)). Here, Melissa asserts that she complained generically of pain, without elaboration as to the severity, and of "not feeling well at all." (Aff. of Melissa Woods ¶¶ 36, 41, 43; Dep. of Melissa Woods at 55, 58-59, 61.) She was diagnosed the next day "with a wrist sprain and a sacrum-coccyx contusion." (Id. ¶¶ 42, 45, 47-48, 50.) There is therefore no evidence from which a jury could conclude that Melissa was suffering from a medical condition that could have produced death, degeneration or extreme pain while in Defendants' care. See Dallio v. Hebert, 678 F.Supp.2d 35, 60 (N.D.N.Y. 2009) ("two black eyes, bruising in his kidney area on his left side, kick marks and open lacerations on his knees, bruising and red spots on his thigh, lacerations on his arms and wrists, a headache, and numbness in his hands and fingers" insufficient to establish a serious medical need); Dzwonczyk v. Syracuse City Police Dept., 710 F.Supp.2d 248, 268 (N.D.N.Y. 2008) (bruised rib did not satisfy sufficiently serious requirement); see also Rodriguez v. Mercado, No. 00 CIV 8588, 2002 WL 1997885, *8 (S.D.N.Y. Aug. 28, 2002) (dismissal of claim warranted where plaintiff failed to adduce any evidence to suggest his injuries "were so urgent or life-threatening that they required immediate care"). Plaintiffs' fifth cause of action is therefore dismissed.

*4. Qualified Immunity*

Defendants argue in the alternative that Officers Held and Hebeler are entitled to qualified immunity because their actions in arresting Melissa were objectively reasonable. (Defs' Mem of Law at 12-14.) "The doctrine of qualified immunity protects government

officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " Pearson v. Callahan, 555 U.S. 223, 231, 129 S.Ct. 808, 815, 172 L.Ed.2d 565 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). As discussed above, this Court has already rejected Defendants' argument that the officers' actions were objectively reasonable, inasmuch as this argument is improperly based on a view of the facts in a light most favorable to Defendants, not Plaintiffs. (Defs' Mem of Law at 14.) Further, although it may have been reasonable for Officer Hebeler to rely on Officer Held's indication of "we are in" to enter the house without a warrant, (Hebeler Dep. at 19); see Micalizzi v. Ciamarra, 206 F.Supp.2d 564, 577 (S.D.N.Y. 2002) (objectively reasonable for officer to rely on fellow officer's report), Defendants fail to account for Kathryn's version of events. It appears from Kathryn's deposition testimony that Officer Hebeler was present when Officer Held allegedly pushed past Kathryn, took the phone from her hands, and smashed it on the floor. (Dep. of Kathyrn Woods at 48-49.) Accordingly, there is a triable issue of fact whether any belief on the part of Officer Hebeler that Officer Held obtained consent for the entry was reasonable.

**C.     The State Law Claims**

*1.     Battery, Assault, and Intentional Infliction of Emotional Distress*

Plaintiffs assert a claim of battery against Held, Hebeler, and the Town with respect to Kathryn (second cause of action), and claims of battery and assault against Held and the Town with respect to Melissa (sixth and seventh causes of action). Defendants' only argument in support of dismissing these claims is the same as that raised in support of dismissal of the § 1983 claims of warrantless entry and excessive force: "Officer Held's use

of force was reasonable given the circumstances he faced and Officer Hebeler used no force against the [P]laintiffs." (Defs' Mem of Law at 14-15.) As with Defendants' earlier arguments, however, this argument is also inappropriately based on the facts presented in a light most favorable to Defendants, without consideration of Plaintiffs' deposition testimony or affidavits.

Further, Defendants fail to address the fact that these claims are also asserted against the Town. "[U]nlike a claim pursuant to 42 USC § 1983, a municipality may be vicariously liable on a state law assault and battery claim for torts committed by a police officer under a theory of respondeat superior." Eckardt v. City of White Plains, 87 A.D.3d 1049, 1051, 930 N.Y.S.2d 22 (N.Y. App. Div. 2d Dep't 2011). Thus, "[t]he remaining state law claim[s] of assault and battery against the [Town are] alive due to the potential for vicarious liability for actions of its police officers as its employees." Williams v. City of White Plains, 718 F.Supp.2d 374, 381 (S.D.N.Y. 2010).

Plaintiff also allege a claim for intentional infliction of emotional distress against Held and the Town (eighth cause of action). This claim must be dismissed as against the Town because, under New York law, " 'public policy bars claims for intentional infliction of emotional distress against a governmental entity' " D'Angelo-Fenton v. Town of Carmel, 470 F.Supp.2d 387, 399 (S.D.N.Y. 2007) (quoting Wyllie v. Dist. Attorney of County of Kings, 2 A.D.3d 714, 720, 770 N.Y.S.2d 110 (N.Y. App Div 2d Dep't 2003)); see Lauer v. City of New York, 240 A.D.2d 543, 544, 659 N.Y.S.2d 57, 58 (N.Y. App Div 2 Dep't 1997), *lv denied* 91 NY2d 807 (NY 1998). The same conclusion is not reached with respect to Defendant Held, inasmuch as Defendants rely solely on the facts and argument that this Court already found insufficient to establish their entitlement to summary judgment on

Plaintiffs' other claims. (Defs' Mem of Law at 15 ("[f]or the reasons articulated above, the actions of each of the defendants were objectively reasonable . . .")).

    2.    *Negligence in Hiring, Training, and Supervision*

In their ninth cause of action, Plaintiffs seek damages for the Town's alleged negligent hiring, training, and supervision of Officers Held and Hebeler. (Am. Compl. ¶¶ 101-103.) Defendants argue that this claim must be dismissed because "the negligence alleged is based upon activities relating to an arrest," (Defs' Mem of Law at 17), therefore Plaintiffs "must resort to the traditional remedies of false imprisonment and malicious prosecution and cannot recover under the broader principles of negligence." Pawlicki v. City of Ithaca, 993 F.Supp. 140, 143 (N.D.N.Y. 1998). Unlike the cases on which Defendants rely, however, Plaintiffs' negligence claim here is not duplicative of a false arrest or malicious prosecution claim. Compare with Pawlicki, 993 F.Supp. at 143-44 (claims based on lack of probable cause for arrest); Shea v. County of Erie, 202 A.D.2d 1028, 609 N.Y.S.2d 473 (N.Y. App Div 4th Dep't 1994) (false arrest and unlawful imprisonment based on negligent failure to confirm satisfactory completion of conditional discharge requirement); Boose v. City of Rochester, 71 A.D.2d 59, 62 (N.Y. App Div 4th Dep't 1979) (alleged negligence in investigation by police into identity of criminal defendant before obtaining warrant led to false arrest). Here, Plaintiffs need not challenge whether Officer Held had probable cause for the arrest in order to succeed on their claims.

Nonetheless, this claim must be dismissed. Generally, under New York law, "an employer will be held liable for torts committed by an employee who is acting within the scope of his or her employment under a theory of respondeat superior, and 'no claim may proceed against the employer for negligent hiring, retention, supervision or training.' "

15

Eckardt, 87 A.D.3d at 1051 (quoting Talavera v. Arbit, 18 A.D.3d 738, 738, 795 N.Y.S.2d 708 (N.Y. App Div 2d Dep't 2005)). "Here, the actions complained of occurred during the arrest and detention of the plaintiff by several police officers . . . . It is beyond dispute that these actions were performed by the officers in the scope of their employment with the [Town]." Eckardt, 87 A.D.3d at 1051. Further, because Plaintiffs have not alleged gross negligence on the part of the Town, the exception to this general rule does not apply. See Coville v. Ryder Truck Rental, Inc., 30 A.D.3d 744, 744-45, 817 N.Y.S.2d 179 (N.Y. App Div 3d Dep't 2006) ("such a claim is permitted when punitive damages are sought based upon facts evincing *gross negligence*" (emphasis added)); see also Sharapata v. Town of Islip, 56 N.Y.2d 332, 338-39, 437 N.E.2d 1104, 1107 (N.Y.1982) (punitive damages may not be assessed against a municipality).

## IV. CONCLUSION

For the reasons set forth above, Defendant Cheektowaga Police Department is dismissed from the action. Defendants' motion is granted with respect to the § 1983, intentional infliction of emotional distress, and negligent hiring, training, and supervision claims as against the Town, and with respect to the fifth cause of action as against all Defendants. The remainder of Defendants' motion is denied.

## V. ORDERS

IT HEREBY IS ORDERED that Defendants' motion for summary judgment (Docket No. 11) is GRANTED in part and DENIED in part as stated above.

SO ORDERED.

Dated: October 23, 2012
       Buffalo, New York

                                          /s/William M. Skretny
                                         WILLIAM M. SKRETNY
                                             Chief Judge
                                       United States District Judge